Karra J. Porter, #5223
Nathan D. Alder, #7126
Kristen C. Kiburtz, #12572
Yuchen Cook, #18894
**CHRISTENSEN & JENSEN, P.C.**
257 East 200 South, Suite 1100
Salt Lake City, Utah  84111-2047
Telephone:  (801) 323-5000
Karra.Porter@cjlaw.com
Nathan.Alder@cjlaw.com
Kristen.Kiburtz@cjlaw.com
Yuchen.Cook@cjlaw.com

Lori G. Feldman*
Justin Alvarez-Herman*
Tiffany Wong*
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, NY 10017
Phone: (212) 851-6821
lfeldman@hechtpartners.com
jalvarezherman@hechtpartners.com
twong@hechtpartners.com
*Pro Hac Vice forthcoming*

*Attorneys for Plaintiffs and the Putative Class*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JASMINE HERNANDEZ-SILVA on behalf of her minor children M.C. 1, M.C. 2, and M.C. 3, and EMILY REWOLINSKI, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>INSTRUCTURE, INC.,<br><br>        Defendant. | **CLASS ACTION COMPLAINT**<br><br><br>Case No. 2:26-cv-00407 |

### INTRODUCTION

1.      Plaintiffs Jasmine Hernandez-Silva, individually and as the parent and guardian of her minor children M.C. 1, M.C. 2 and M.C. 3, and Emily Rewolinski (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated ("Class Members" or "the Class"), by and through their undersigned counsel, bring this action against Defendant Instructure, Inc. ("Instructure" or "Defendant") based upon personal knowledge with respect to themselves and on

information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## I.     SUMMARY OF THE ACTION

2.     Plaintiffs bring this class action against Defendant Instructure for its failure to secure and safeguard consumers' personally identifiable information ("PII" or "Private Information") entrusted to Defendant in connection with Defendant's educational technology and learning management platform services, and for failing to provide timely, accurate, and adequate notice that Plaintiffs' and Class Members' Private Information had been accessed and compromised by unauthorized third parties, including failing to disclose the full scope and precise nature of the information exposed in the Data Breach.

3.     Defendant collected, processed, stored, and maintained the highly sensitive Private Information of Plaintiffs and Putative Class Members through its Canvas learning management platform used by schools, universities, educators, and students throughout the United States.

4.     Defendant owed a non-delegable duty to Plaintiffs and Class Members to implement reasonable and adequate cybersecurity measures to protect their Private Information.

5.     Failing to implement reasonable and adequate cybersecurity measures has significant consequences for the students, teachers, staff, and other users whose Private Information and private communications are unlawfully accessed by cybercriminals and threat actors.

6.     On or around April 30, 2026, Defendant announced that it was experiencing a service disruption. The following day, May 1, 2026, Defendant confirmed that it had experienced

2

a "cybersecurity incident perpetrated by a criminal threat actor."[1] During this cybersecurity incident (the "Data Breach"), cybercriminals claim that they gained access to and acquired 275 million individuals' data ranging from students, teachers, and other staff containing PII."[2]

7.    The Private Information of Plaintiffs and the Class of individuals they seek to represent was compromised due to Defendant's acts and omissions and failure to implement adequate and reasonable cyber-security measures to ensure its computer systems were protected.

8.    Defendant could have prevented this Data Breach. The threat actor known as ShinyHunters has a well-documented history of targeting major organizations through large-scale cyberattacks and extortion schemes, including recent breaches reportedly linked to Salesforce, PowerSchool, Infinite Campus, McGraw Hill, Rockstar Games, and several Ivy League universities. Moreover, this was not Defendant's first encounter with the same threat actor. Approximately eight months earlier, in or around September 2025, ShinyHunters allegedly compromised Defendant's Salesforce environment through a social engineering attack, placing Defendant on direct notice of the foreseeable risk of future cyberattacks targeting its systems and the sensitive information entrusted to it.[3]

---

[1] *See* Matt Binder, Instructure Data Breach: ShinyHunters Says It Stole Data and Private Messages from 275 Million Teachers and Students, Mashable (May 11, 2026), https://mashable.com/article/instructure-canvas-edtech-data-breach-shinyhunters (last accessed May 11, 2026).

[2] *See* Lawrence Abrams, *Instructure Confirms Data Breach, ShinyHunters Claims Attack*, BleepingComputer (May 3, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/ (last accessed May 11, 2026).

[3] *See* David Navetta & Sam Hsu, *Client Alert: Instructure Data Breach*, JDSupra (May 6, 2026), https://www.jdsupra.com/legalnews/client-alert-instructure-data-breach-7807251/ (last accessed May 11, 2026).

9. The Data Breach was the inevitable result of Defendant's inadequate approach to data security and the protection of the Private Information that it collected during the course of its business.

10. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard the Private Information, failing to take available steps to prevent and stop the breach from occurring, and failing to monitor and detect the breach on a timely basis.

11. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

12. Through this Complaint, Plaintiffs seek to redress the injuries related to the Data Breach on behalf of themselves and all similarly situated individuals whose Private Information was unlawfully accessed and stolen during the Data Breach.

4

13.     Plaintiffs and Class Members have a continuing interest in ensuring that their Private Information is properly safeguarded, and they should be entitled to injunctive and other equitable relief.

## II.     PARTIES

14.     Plaintiff M.C. 1 is a minor. At all relevant times, he has been a citizen of the state of California, County of Los Angeles. M.C. 1 attends school in a California public school district. As part of his public schooling, he was required to access and use Instructure products and services.

15.     Plaintiff M.C. 2 is a minor. At all relevant times, she has been a citizen of the state of California, County of Los Angeles. M.C. 2 attends school in a California public school district. As part of her public schooling, she was required to access and use Instructure products and services.

16.     Plaintiff M.C. 3 is a minor. At all relevant times, she has been a citizen of the state of California, County of Los Angeles. M.C. 3 attends school in a California public school district. As part of her public schooling, she was required to access and use Instructure products and services.

17.      Plaintiff Jasmine Hernandez-Silva is the mother and legal guardian of Plaintiffs M.C. 1, M.C. 2, and M.C. 3. At all relevant times, she has been a citizen of the state of California.

18.     The school district attended by Plaintiffs M.C. 1, M.C. 2, and M.C. 3 is among the various school districts that use Defendant's Canvas product and whose data was exfiltrated during the Data Breach. As a direct and proximate result of Defendant's conduct, M.C. 1, M.C. 2, and M.C. 3 have suffered and will continue to suffer the injuries described herein, including an imminent and substantially heightened risk of identity theft and fraud, lost time and effort

responding to the Data Breach, diminution in the value of their Private Information, and loss of privacy.

19. Plaintiff Emily Rewolinski is a resident and citizen of the State of Minnesota, County of Hennepin. Plaintiff Rewolinski is currently enrolled as a student at the Mitchell Hamline School of Law in Saint Paul, Minnesota. Throughout her enrollment at Mitchell Hamline, including at all times relevant to the Data Breach, Plaintiff Rewolinski used Defendant's Canvas platform to access coursework, submit assignments, view grades, and communicate with professors, school personnel, and classmates. In connection with that use, Plaintiff Rewolinski transmitted, stored, and maintained her Private Information on Defendant's systems and platform. As a direct and proximate result of Defendant's conduct, Plaintiff Rewolinski has suffered and will continue to suffer the injuries described herein, including an imminent and substantially heightened risk of identity theft and fraud, lost time and effort responding to the Data Breach, diminution in the value of her Private Information, and loss of privacy.

20. Defendant Instructure Inc. is a Delaware corporation with its headquarters and principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, Utah 84121.

### III.   JURISDICTION AND VENUE

21. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum value of $5,000,000.00, involves more than 100 class members, and at least some Class Members are citizens of different states than Defendant.

22. This Court has personal jurisdiction over Defendant because it is registered to do business and maintains its principal place of business in this District.

23.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is in this District and therefore Defendant resides in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is further proper in this District under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Class' claims also occurred in this District.

### IV.      ADDITIONAL FACTUAL ALLEGATIONS

***Defendant Acquires, Collects, and Maintains Plaintiffs' and Class Members' Private Information***

24.      Defendant Instructure is an education technology company that provides learning management and educational platform services, including through its Canvas platform, to schools, school districts, colleges, and universities throughout the United States. In the ordinary course of providing these services, Defendant collects, stores, and maintains highly sensitive Private Information and educational data belonging to current and former students, teachers, staff, and other users, including names, email addresses, student identification numbers, educational records, private communications, and other sensitive information entrusted to Defendant through its platforms.

25.      Defendant Instructure operates Canvas, one of the most widely used educational technology and learning-management platforms in the United States and North America. Canvas is reportedly used by approximately 41% of educational institutions in the United States and by tens of millions of students nationwide.[4] Industry analysts further estimate that Canvas holds

---

[4] *See* Lisa Nagele-Piazza & Catherine M. Tsai, *The Canvas Breach: What Educational Institutions Need to Know and How You Can Respond*, Fisher Phillips (May 7, 2026), https://www.fisherphillips.com/en/insights/insights/the-canvas-breach-what-educational-institutions-need-to-know-and-how-you-can-respond (last accessed May 11, 2026).

approximately 47% of the learning-management-system market among higher education institutions in North America and 28% in the K-12 sector.[5]

26.   As part of Defendant's regular course of business, current and former students, teachers, staff, and other users, including Plaintiffs and Class Members, were required to provide their highly sensitive Private Information to Defendant in connection with their use of Defendant's Canvas platform and related educational services.

27.   Upon information and belief, as part of its regular course of business, Defendant thereafter maintained and stored Plaintiffs' and Class Members' Private Information on its systems.

28.   Upon information and belief, while collecting Private Information from Plaintiffs and Class Members, Defendant promised to provide confidentiality and adequate security for the data that it collected from them through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

29.   By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

30.   Defendant represents on its website that it is committed to protecting the information entrusted to it, stating that it is "committed to protecting the information [it] process[es]" and ensuring such information "is used only to support students and education." [6]

---

[5] *See* Tara Seals, *ShinyHunters Strikes Instructure for a Second Time*, Dark Reading (May 8, 2026), https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-second-attack-instructure (last accessed May 11, 2026).

[6] *See Product Privacy Notice*, Instructure (effective Oct. 31, 2025), https://www.instructure.com/policies/product-privacy-policy (last accessed May 11, 2026).

Defendant further represented that it was guided by foundational privacy principles including "Transparency," "Accountability," "Integrity," "Security," and "Confidentiality."[7]

31.    Defendant assured its users that it would "implement and maintain appropriate technical, administrative, and organizational measures to protect data in accordance with regulatory requirements."[8] Defendant likewise represented that it would "establish and maintain policies, procedures, and practices that limit access to data and protect against unlawful or unintentional access or disclosure."[9] Plaintiffs and Class Members reasonably relied upon these representations when entrusting Defendant with their highly sensitive Private Information.

32.    Due to the nature of Defendant's educational technology and learning management services, Defendant stores current and former students', teachers', staff members', and other users' Private Information within its systems, including through its Canvas platform and related services. Defendant maintains this Private Information electronically, as evidenced by the Data Breach.

33.    Current and former students, teachers, staff, schools, and other users reasonably expect Defendant to safeguard their highly sensitive Private Information. As an education technology company that collects and maintains substantial quantities of educational and personally identifiable information through its Canvas platform and related services, Defendant was required to ensure that such Private Information was not disclosed or disseminated to unauthorized third parties.

34.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should

---

[7] *Id.*
[8] *Id.*
[9] *Id.*

have known it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

35.     Plaintiffs and Class Members, as current and former users of Defendant's Canvas platform and related educational technology services, relied on Defendant's representations regarding privacy and data security, including  that it would "implement and maintain appropriate technical, administrative, and organizational measures to protect data" and "establish and maintain policies, procedures, and practices that limit access to data and protect against unlawful or unintentional access or disclosure," to keep their sensitive Private Information confidential, securely maintained, and disclosed only as authorized.[10]

36.     Yet, contrary to these representations and obligations, Defendant failed to adequately safeguard Plaintiffs' and Class Members' Private Information and failed to implement reasonable data security measures, as evidenced by the Data Breach, which has affected, to date, the Private Information of approximately 275 million individuals.

***The Data Breach and Defendant's Failure to Adequately Disclose Same***

37.     On or around April 25, 2026, Defendant experienced a "cybersecurity incident perpetrated by a criminal threat actor."[11] According to statements later circulated to customers and educational institutions impacted by the incident, the suspicious activity on Defendant's systems allegedly went undetected for approximately four days until April 29, 2026, when Defendant purportedly discovered the unauthorized access and "immediately revoked the access."[12]

---

[10] *Id.*

[11] *See* Tara Seals, *ShinyHunters Strikes Instructure for a Second Time*, Dark Reading (May 8, 2026),    https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-second-attack-instructure (last accessed May 11, 2026).

[12] *See Important Update Regarding Canvas Data Breach*, Pitt County Schools (May 7, 2026), https://www.pitt.k12.nc.us/post-details-dbpp/~board/featured-stories-pitt-county-schools-17646/post/important-update-regarding-canvas-data-breach (last accessed May 11, 2026).

Defendant further represented to customers that, on April 30, 2026, as its investigation expanded, it "revoked additional suspicious access and addressed [an] underlying system vulnerability."[13]

38.    On or around April 30, 2026, Defendant first announced on its public status page that certain customers were experiencing disruptions to "tools relying on API keys" and stated that it had taken "precautionary steps" while investigating the issue.[14] Thereafter, on May 1, 2026, Defendant publicly confirmed that it had experienced a "cybersecurity incident" and stated that it was actively investigating the incident alongside outside forensic experts.[15]

39.    On May 2, 2026, Defendant publicly stated that, while its investigation remained ongoing, it believed that "the incident ha[d] been contained."[16] On May 6, 2026, Defendant further represented that Canvas was "fully operational" and that it was "not seeing any ongoing unauthorized activity."[17] However, by May 7, 2026, Defendant again placed portions of the Canvas platform into maintenance mode while continuing to investigate additional disruptions affecting the platform.[18]

40.    Despite Defendant's May 6, 2026, status-page update stating that Canvas was "fully operational" and that Defendant was "not seeing any ongoing unauthorized activity," public reporting thereafter indicated that students and teachers continued experiencing service interruptions and alleged ransomware splash pages associated with ShinyHunters as recently as May 7, 2026. Public reporting further indicated that ShinyHunters claimed Defendant had been breached "again" and asserted that "[i]nstead of contacting us to resolve it they ignored us and did

---

[13] *Id.*

[14] *See Instructure Status*, Instructure, https://status.instructure.com/ (last accessed May 11, 2026).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

some 'security patches.'" [19] The threat actors further claimed that Defendant "didn't fix all the vulnerabilities" and threatened to release additional data if institutions did not "negotiate a settlement."[20]

41.    As a result, some affected schools began walking back earlier, more optimistic statements relayed by Defendant regarding the status of the incident. For example, after Rutgers University relayed Defendant's May 6, 2026 representations to students and staff—including that "Canvas is fully operational" and that users "do not need to take any action in connection with this incident at this time"—Rutgers publicly stated the following day, on May 7, 2026, that it was "aware of an unauthorized message posted to Canvas related to the nationwide data breach at Instructure" and warned that "Canvas may have limited or no availability for certain users." [21]

42.    Public reporting further described students allegedly encountering ransomware splash pages instead of normal Canvas pages while attempting to access grades, coursework, and communications through the platform during final examination periods. One student reportedly stated that, when attempting to access his grades on May 7, 2026, he "was greeted by the ransom message instead of the normal Canvas page" and was unable to use Canvas to communicate with professors or classmates. [22] Defendant thereafter reportedly acknowledged an "ongoing security

[19] *See* Max Mester, *Penn Canvas Users Potentially Impacted by Nationwide Data Breach*, The Daily Pennsylvanian (May 6, 2026), https://www.thedp.com/article/2026/05/penn-canvas-shinythunters-data-breach-hack-second (last accessed May 11, 2026).
[20] *Id.*
[21] *See Nationwide Security Breach Involving Canvas*, Rutgers Office of Information Technology (May 4, 2026), https://it.rutgers.edu/alerts/2026/05/04/nationwide-security-breach-involving-canvas/ (last accessed May 11, 2026).
[22] *See* Tara Seals, *ShinyHunters Strikes Instructure for a Second Time*, Dark Reading (May 8, 2026), https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-second-attack-instructure (last accessed May 11, 2026).

incident" involving certain "Free-For-Teacher" accounts and stated that it had temporarily shut down those accounts in an effort to contain the incident. [23]

43.     The scope of the Data Breach appears extraordinary. According to statements published by the threat actor ShinyHunters on its data leak site, the incident allegedly impacted "nearly 9,000 schools worldwide" and involved "275 million individuals data ranging from students, teachers, and other staff containing PII."[24] ShinyHunters further claimed that Defendant's systems contained "several billions of private messages among students and teachers and students and other students," including "personal conversations and other PII."[25] The threat actors additionally claimed that Defendant's Salesforce environment had also been compromised and that "a lot more other data is involved."[26]

44.     The Data Breach occurred because Defendant did not implement adequate and reasonable cyber-security procedures and protocols to protect the Private Information of Plaintiffs and Class Members.  Because Defendant's data security protocols and practices were deficient, unauthorized person(s) were able to access, view, and/or exfiltrate Plaintiffs' and Class Members' Private Information.

45.     Plaintiffs further believe that their Private Information and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

---

[23] *Id.*

[24] *See* Lawrence Abrams, *Instructure Hacker Claims Data Theft from 8,800 Schools, Universities*, BleepingComputer (May 5, 2026), https://www.bleepingcomputer.com/news/security/instructure-hacker-claims-data-theft-from-8-800-schools-universities/ (last accessed May 11, 2026).

[25] *Id.*

[26] *Id.*

***Defendant's Data Breach Was Imminently Foreseeable and Preventable***

46.     Despite the growing body of publicly available information regarding the rise of cyberattacks that compromise sensitive private information, Defendant's approach to maintaining the privacy of Plaintiffs' and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. This is evidenced by the Data Breach.

47.     It is well known that highly sensitive Private Information of individuals are highly valuable commodities and frequent targets of cybercriminals. Companies that collect and maintain such sensitive information, including Defendant, know or reasonably should know that they are attractive targets for cyberattacks.

48.     Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[27] Yahoo,[28] Marriott International,[29] Chipotle,[30] Equifax,[31] PowerSchool,[32] and others.

---

[27] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNet (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ (last accessed May 11, 2026).

[28] Steve Ragan, *Inside the Russian Hack of Yahoo: How They Did It*, CSO Online (Oct. 4, 2017), https://www.csoonline.com/article/560623/inside-the-russian-hack-of-yahoo-how-they-did-it.html (last accessed May 11, 2026).

[29] *Autopsying the Marriott Data Breach: This Is Why Insurance Matters*, The SSL Store (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last accessed May 11, 2026).

[30] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/privacy/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b (last accessed May 11, 2026).

[31] Dan Swinhoe, *The Biggest Data Breaches of the 21st Century*, CSO Online (updated June 12, 2025), https://www.csoonline.com/article/534628/the-biggest-data-breaches-of-the-21st-century.html (last accessed May 11, 2026).

[32] *See PowerSchool Data Breach: What You Need to Know*, Security.org, https://www.security.org/identity-theft/breach/powerschool/ (last accessed May 11, 2026).

49.     Over a five-year period, data compromises have increased by seventy-nine percent (79%), rising from 1,859 incidents in 2021 to 3,322 in 2025, underscoring the rapidly intensifying threat landscape.[33] While the number of reported compromises slightly decreased from 3,202 in 2023 to 3,158 in 2024, 2024 saw a record-breaking number of victim notices issued in the United States, with over 1.3 billion notices sent to individuals impacted by data breaches.[34] The number of compromises rose again in 2025, reaching a new high-water mark, and this trend has continued into 2026, with large-scale breaches remaining prevalent, including the CarGurus data breach February 2026, which reportedly impacted more than 12 million individuals.[35]

50.     Moreover, in recent years, several of Defendant's competitors and other major education technology companies have similarly experienced significant data breach and cybersecurity incidents. In December of 2024, PowerSchool, a provider of K-12 education software used by over 50 million students globally suffered a ransomware attack which impacted approximately 60 million students and 10 million educators.[36] Additionally, in 2021, Illuminate Education, a student information provider, suffered a breach which exposed the personal information of over 10 million students nationwide.[37]

---

[33] Identity Theft Res. Ctr., *2025 Annual Data Breach Report*, https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf  (last accessed May 11, 2026).

[34] *Id.*

[35] Eduard Kovacs, *Over 12 Million Users Impacted by CarGurus Data Breach*, SecurityWeek, https://www.securityweek.com/over-12-million-users-impacted-by-cargurus-data-breach/  (last accessed May 11, 2026).

[36] *See* Lawrence Abrams, *PowerSchool Hacker Claims They Stole Data of 62 Million Students*, BleepingComputer (Jan. 8, 2025), https://www.bleepingcomputer.com/news/security/powerschool-hacker-claims-they-stole-data-of-62-million-students/  (last accessed May 11, 2026).

[37] *See* Roger Riddell, *Illuminate Education Reaches Settlement with FTC over 2021 Data Breach*, K-12 Dive (Sept. 24, 2025), https://www.k12dive.com/news/illuminate-education-reaches-settlement-with-ftc-over-2021-data-breach/806814/  (last accessed May 11, 2026).

51.     Moreover, this was Defendant's second compromise involving the same threat actor in less than a year. In or around September 2025, ShinyHunters used social-engineering tactics to gain access to Defendant's Salesforce environment.[38] Although Defendant reportedly disclosed that incident and rotated credentials, the present Data Breach allegedly involved additional compromises affecting Defendant's systems and related infrastructure only months later. These repeated incidents underscore that Defendant was on notice of the ongoing cybersecurity risks facing its systems and nevertheless failed to implement and maintain adequate safeguards to prevent subsequent unauthorized access and disclosure of sensitive data.

52.     To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the United States Government:

- **Implement an awareness and training program:** Educate employees and individuals about the threat of ransomware and how it is delivered, as end users are often the primary targets.

- **Enable strong spam filters:** Prevent phishing emails from reaching end users by using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to block email spoofing.

- **Scan all incoming and outgoing emails:** Detect threats by scanning emails and filtering executable files to prevent them from reaching end users.

- **Configure firewalls:** Block access to known malicious IP addresses to prevent unauthorized access.

---

[38] *See* Yoav Regev, *The Instructure Breach Was Salesforce Again: Here's the Governance Problem Nobody Is Talking About*, Sentra (May 8, 2026), https://www.sentra.io/blog/the-instructure-breach-was-salesforce-again-heres-the-governance-problem-nobody-is-talking-about (last accessed May 11, 2026).

16

- **Patch operating systems, software, and firmware:**  Regularly update and patch devices, potentially using a centralized patch management system for greater efficiency.

- **Set anti-virus and anti-malware programs for regular scans:**  Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage privileged accounts based on the principle of least privilege:**  Limit administrative access to users only when absolutely necessary, and ensure those with admin privileges use them only when required.  Implement an awareness and training program.

- **Configure access controls:** Implement least privilege principles for file, directory, and network share permissions.  Users should only have access to what they need—if a user only needs to read specific files, they should not have write access to those files, directories, or shares.

- **Disable macro scripts in office files transmitted via email:**  Prevent the execution of potentially harmful macros by disabling them in office files sent via email. Consider using Office Viewer software instead of full office suite applications to open email attachments.

- **Implement Software Restriction Policies (SRP):**  Use SRPs or similar controls to prevent programs from executing from common ransomware locations, such as temporary folders associated with web browsers or compression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop Protocol (RDP):**  If RDP is not in use, consider disabling it to reduce potential attack vectors.

- **Use application whitelisting:**  Allow only programs that are explicitly permitted by security policy to execute, blocking any unauthorized or potentially malicious software.

- **Execute operating system environments or specific programs in a virtualized environment:**  Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value:** Implement physical and logical separation of networks and data for different organizational units to protect critical information and ensure appropriate access control.[39]

53.  To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Federal Trade Commission ("FTC") in its latest update to *Protecting Personal Information: A Guide for Business*:

- Know what personal information you have in your files and on your computers.

- Keep only what you need for your business.

- Protect the information that you keep.

- Properly dispose of information you no longer need.

- Create a plan to respond to security incidents.[40]

54.  To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Joint Ransomware Task Force's ("JRTF") #StopRansomware Guide, although this list does not encompass the full range of recommended actions:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers-that

---

[39] U.S. Dep't of Just., Crim. Div., Computer Crime & Intellectual Prop. Section, How to Protect Your Networks from Ransomware, https://www.justice.gov/criminal/criminal-ccips/file/872771/dl (last accessed Apr. 7, 2026).

[40] Federal Trade Commission, *Protecting Personal Information: A Guide for Business,* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed May 11, 2026).

operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being used for business purposes.[41]

55. As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members because of a breach.

56. Despite widespread reports of data breaches, Defendant neglected to implement the necessary safeguards to ensure the Private Information of Plaintiffs and Class Members was protected.

57. Defendant was, or should have been, fully aware of the unique types and the significant volume of data in its systems, amounting to potentially millions individuals' Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of this data.

58. Given that Defendant was storing the Private Information it required Plaintiffs and Class Members to provide, Defendant could and should have implemented some or all the above measures to prevent and detect cyberattacks.

---

[41] Cybersecurity & Infrastructure Security Agency, *#StopRansomware Guide*, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last accessed May 11, 2026).

59.     The occurrence of the Data Breach indicates that Defendant failed to implement one or more of the above measures to prevent cybersecurity attacks.  The failure to implement some or all of the above measures resulted in the Data Breach and the exposure of approximately 275 million Class Members' Private Information.

*Plaintiffs' and Class Members' Private Information is Highly Sensitive*

60.     The Private Information compromised in the Data Breach is highly sensitive. The allegedly compromised data includes, among other things, names, school-issued email addresses, student identification numbers, enrollment information, and private communications exchanged through Defendant's Canvas platform. Such information can be exploited by cybercriminals to carry out sophisticated phishing attacks, impersonation schemes, and other forms of social engineering directed at students, teachers, schools, and families. Because the compromised communications allegedly included messages exchanged between students and teachers, threat actors may be able to leverage highly specific contextual information to make fraudulent communications appear legitimate and trustworthy.

61.     The risks associated with the Data Breach are especially severe because the incident allegedly affected thousands of K-12 schools and exposed information associated with minors. As cybersecurity experts have noted, breaches involving children's information present unique and long-term dangers because minors often have no reason to monitor their credit or identity information for years. Consequently, compromised educational and personal information associated with minors can remain valuable to identity thieves and other malicious actors long after the initial breach occurs.

62.     The Data Breach also threatens disclosure of highly personal and sensitive information communicated through the Canvas platform. On information and belief, the

20

compromised messages and educational records may contain discussions concerning academic performance, disciplinary matters, disabilities, accommodations, mental-health concerns, family circumstances, and other confidential information ordinarily shared in educational settings with the expectation of privacy. The threatened exposure or dissemination of such information creates a substantial and ongoing privacy risk for Plaintiffs and Class Members.

63.     On information and belief, the Private Information compromised in the Data Breach has independent economic value to cybercriminals and is likely to be circulated, offered for sale, or otherwise exploited on criminal marketplaces and forums. The scale of the Data Breach, together with the breadth of the allegedly compromised educational and communications data, increases the risk that Plaintiffs' and Class Members' information will be used for identity theft, fraud, targeted scams, and other malicious purposes for years to come.

64.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[42]

65.     Plaintiffs and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[42] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/assets/gao-07-737.pdf (last accessed May 11, 2026).

*Defendant Failed to Comply with FTC Guidelines*

66.     Defendant was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. § 45), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has determined that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

67.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

68.     For example, in 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines advise businesses, *inter alia*, to protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[43]

69.     The guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; to watch for large amounts of data being transmitted

---

[43] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 11, 2026).

22

from the system; and to verify that third-party service providers have implemented reasonable security measures.[44]

70.     To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of FTCA, 15 U.S.C. § 45.[45] Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices.

72.     Upon information and belief, Defendant was at all times fully aware of its obligations to protect the Private Information of Plaintiffs and Class Members, and Defendant was also aware of the significant repercussions that would result from its failure to do so.

73.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information, or to comply with applicable industry standards, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**The Data Breach Increases Victims' Risk of Identity Theft and Fraud**

74.     Upon information and belief, the unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

---

[44] *Id.*

[45] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) (determining that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act).

75.     Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

76.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

77.     Plaintiffs' and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

78.     Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access and/or develop "fullz packages" of that person.[46]

---

[46] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See* https://venturebeat.com/security/fullz-dumps-and-cvvs-heres-what-hackers-are-selling-on-the-black-market/ (last accessed May 11, 2026).

79.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

80.     The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a comprehensive Fullz package and sell it—and then resell it in perpetuity—at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

81.     Cyberattacks and data breaches like the Data Breach are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

82.     GAO released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[47]

83.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their private information was compromised, the

---

[47] U.S. Gov. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), available at https://www.gao.gov/new.items/d07737.pdf (last accessed. May 11, 2026).

reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

84.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes on their credit and checking their financial accounts. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

85.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[48]

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

86.    Based on the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for various forms of identity theft crimes.

87.    Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

[48] *Id.*

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

88.     Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

89.     The retail cost of credit monitoring and identity theft protection services can range up to approximately $200 per year per Class Member. This represents a reasonable and necessary expense to monitor and protect against the risk of identity theft arising from Defendant's Data Breach.

***Loss of Benefit of the Bargain***

90.     Furthermore, Defendant's inadequate data security practices deprived Plaintiff and Class Members of the benefit of their bargain. Plaintiffs and Class Members, either directly or through their schools, universities, and educational institutions, provided their highly sensitive Private Information to Defendant in exchange for access to and use of Defendant's Canvas platform and related educational technology services. Plaintiffs and Class Members entrusted Defendant with this information, either directly or through their educational institutions, with the reasonable expectation that Defendant would implement and maintain adequate data security measures to safeguard it. Those expectations were reinforced by Defendant's representations concerning privacy, security, regulatory compliance, and the protection of student data. Instead, Defendant allegedly failed to maintain reasonable safeguards sufficient to protect the highly sensitive educational and personal information entrusted to it. Accordingly, the services provided by Defendant were of materially lesser value than what Plaintiffs and Class Members reasonably expected to receive.

*Common Injuries & Damages*

91.     As a direct and proximate result of the Data Breach, Plaintiffs and Class Members suffered and continue to suffer injuries and damages, including, but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

92.     The ramifications of Defendant's failure to safeguard the Private Information of Plaintiff and Class Members are long-lasting and severe.  In 2024 alone, Americans lost $47 billion to identity fraud and scams, a $4 billion increase from 2023.[49] Once private information is stolen, fraudulent use of that information and damage to victims may continue for years.

*Plaintiff Hernandez-Silva and M.C. 1's Experience*

93.     Plaintiff Hernandez-Silva is the mother of minor child, M.C. 1. M.C. 1 is a student within a California school district that utilized the Canvas platform.

94.     In connection with M.C. 1's enrollment and participation in his school district's educational programs, Plaintiff Hernandez-Silva and M.C. 1 were required to provide Private Information to Defendant, either directly or through the school district, in order to access and use Defendant's Canvas platform and related services. According to the school district's notice, the

---

[49] Christina Ianzito, *Identity Fraud and Scams Cost Americans $47 Billion in 2024*, AARP (Mar. 25, 2025), https://www.aarp.org/money/scams-fraud/javelin-identity-theft-report-2024/ (last accessed Apr. 7, 2026).

categories of information maintained on the Canvas platform included email addresses, student ID numbers, assignment grades, and messages exchanged among users within the system.

95.    Plaintiff Hernandez-Silva and M.C. 1 became aware of the Data Breach through an email from the school district on or around May 7, 2026.  The notice stated that Defendant Instructure had informed the district that "an unauthorized party gained access to a portion of their system" and that information associated with users at affected institutions "may have been accessed."

96.    Plaintiff Hernandez-Silva and M.C. 1 are still awaiting formal and direct notice from Defendant identifying the specific categories of their Private Information that were compromised and explaining the manner in which their information was accessed, exposed, or otherwise affected by the Data Breach.

97.    Because the Data Breach was an intentional attack by cybercriminals seeking valuable information that they could exploit, Plaintiff Hernandez-Silva and M.C. 1 remain at critical risk of severe identity theft and exploitation.

98.    Plaintiff Hernandez-Silva and M.C. 1 are very careful about not sharing their sensitive Private Information. They have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

99.    Plaintiff Hernandez-Silva and M.C. 1 take great care to store any documents containing their personal information in secure locations or to properly dispose of such documents. They also exercise caution by selecting unique usernames and strong passwords for their online accounts to protect their privacy and security.

100.    Plaintiff Hernandez-Silva and M.C. 1 suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to: (i)

invasion of privacy; (ii) theft of Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

101. The Data Breach has caused Plaintiff Hernandez-Silva and M.C. 1 to suffer fear, anxiety, and stress, which have been compounded by Defendant's failure to fully disclose the scope of the Data Breach and the specific categories of information compromised. Their concerns are further heightened by statements attributed to the threat actor ShinyHunters claiming that Defendant's "Salesforce instance was also breached" and that "a lot more other data is involved," creating additional uncertainty regarding the full extent of the Data Breach and the information potentially affected. This fear, anxiety, and stress have been further amplified by Plaintiff Hernandez-Silva's serious concern for M.C. 1 and the potential long-term impact on his privacy, financial security, education, and future opportunities before he has even reached adulthood.

102. As a result of the Data Breach, Plaintiff Hernandez-Silva anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach for herself and M.C. 1.

103. As a result of the Data Breach, Plaintiff Hernandez-Silva and M.C. 1 are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

30

104.    Plaintiff Hernandez-Silva and M.C. 1 have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Hernandez-Silva and M.C. 2's Experience***

105.    Plaintiff Hernandez-Silva is the mother of minor child M.C. 2. M.C. 2 is a student within a California school district that utilized the Canvas platform.

106.    In connection with M.C. 2's enrollment and participation in her school district's educational programs, Plaintiff Hernandez-Silva and M.C. 2 were required to provide Private Information to Defendant, either directly or through the school district, in order to access and use Defendant's Canvas platform and related services. According to the school district's notice, the categories of information maintained on the Canvas platform included email addresses, student ID numbers, assignment grades, and messages exchanged among users within the system.

107.    Plaintiff Hernandez-Silva and M.C. 2 became aware of the Data Breach through an email from the school district on or around May 7, 2026.  The notice stated that Defendant Instructure had informed the district that "an unauthorized party gained access to a portion of their system" and that information associated with users at affected institutions "may have been accessed."

108.    Plaintiff Hernandez-Silva and M.C. 2 are still awaiting formal and direct notice from Defendant identifying the specific categories of their Private Information that were compromised and explaining the manner in which their information was accessed, exposed, or otherwise affected by the Data Breach.

109.    Because the Data Breach was an intentional attack by cybercriminals seeking valuable information that they could exploit, Plaintiff Hernandez-Silva and M.C. 2 remain at critical risk of severe identity theft and exploitation.

110.    Plaintiff Hernandez-Silva and M.C. 2 are very careful about not sharing their sensitive Private Information. They have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

111.    Plaintiff Hernandez-Silva and M.C. 2 take great care to store any documents containing their personal information in secure locations or to properly dispose of such documents. They also exercise caution by selecting unique usernames and strong passwords for their online accounts to protect their privacy and security.

112.    Plaintiff Hernandez-Silva and M.C. 2 suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

113.    The Data Breach has caused Plaintiff Hernandez-Silva and M.C. 2 to suffer fear, anxiety, and stress, which have been compounded by Defendant's failure to fully disclose the scope of the Data Breach and the specific categories of information compromised. Their concerns are further heightened by statements attributed to the threat actor ShinyHunters claiming that

Defendant's "Salesforce instance was also breached" and that "a lot more other data is involved," creating additional uncertainty regarding the full extent of the Data Breach and the information potentially affected. This fear, anxiety, and stress have been further amplified by Plaintiff Hernandez-Silva's serious concern for M.C. 2 and the potential long-term impact on her privacy, financial security, education, and future opportunities before she has even reached adulthood.

114.    As a result of the Data Breach, Plaintiff Hernandez-Silva anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach for herself and M.C. 2.

115.    As a result of the Data Breach, Plaintiff Hernandez-Silva and M.C. 2 are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

116.    Plaintiff Hernandez-Silva and M.C. 2 have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Hernandez-Silva and M.C. 3's Experience***

117.    Plaintiff Hernandez-Silva is the mother of minor child M.C. 3. M.C. 3 is a student within a California school district that utilized the Canvas platform.

118.    In connection with M.C. 3's enrollment and participation in her school district's educational programs, Plaintiff Hernandez-Silva and M.C. 3 were required to provide Private Information to Defendant, either directly or through the school district, in order to access and use Defendant's Canvas platform and related services. According to the school district's notice, the categories of information maintained on the Canvas platform included email addresses, student ID numbers, assignment grades, and messages exchanged among users within the system.

119. Plaintiff Hernandez-Silva and M.C. 3 became aware of the Data Breach through an email from the school district on or around May 7, 2026. The notice stated that Defendant Instructure had informed the district that "an unauthorized party gained access to a portion of their system" and that information associated with users at affected institutions "may have been accessed."

120. Plaintiff Hernandez-Silva and M.C. 3 are still awaiting formal and direct notice from Defendant identifying the specific categories of their Private Information that were compromised and explaining the manner in which their information was accessed, exposed, or otherwise affected by the Data Breach.

121. Because the Data Breach was an intentional attack by cybercriminals seeking valuable information that they could exploit, Plaintiff Hernandez-Silva and M.C. 3 remain at critical risk of severe identity theft and exploitation.

122. Plaintiff Hernandez-Silva and M.C. 3 are very careful about not sharing their sensitive Private Information. They have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

123. Plaintiff Hernandez-Silva and M.C. 3 take great care to store any documents containing their personal information in secure locations or to properly dispose of such documents. They also exercise caution by selecting unique usernames and strong passwords for their online accounts to protect their privacy and security.

124. Plaintiff Hernandez-Silva and M.C. 3 suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated

with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

125.     The Data Breach has caused Plaintiff Hernandez-Silva and M.C. 3 to suffer fear, anxiety, and stress, which have been compounded by Defendant's failure to fully disclose the scope of the Data Breach and the specific categories of information compromised. Their concerns are further heightened by statements attributed to the threat actor ShinyHunters claiming that Defendant's "Salesforce instance was also breached" and that "a lot more other data is involved," creating additional uncertainty regarding the full extent of the Data Breach and the information potentially affected. This fear, anxiety, and stress have been further amplified by Plaintiff Hernandez-Silva's serious concern for M.C. 3 and the potential long-term impact on her privacy, financial security, education, and future opportunities before she has even reached adulthood.

126.     As a result of the Data Breach, Plaintiff Hernandez-Silva anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach for herself and M.C. 3.

127.     As a result of the Data Breach, Plaintiff Hernandez-Silva and M.C. 3 are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

128.     Plaintiff Hernandez-Silva and M.C. 3 have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Emily Rewolinski's Experience*

129.     Plaintiff Rewolinski is an adult and current third-year law student at Mitchell Hamline School of Law in Saint Paul, Minnesota, which utilized Defendant's Canvas platform.

130.     In connection with her enrollment and participation in Mitchell Hamline's educational programs, Plaintiff Rewolinski was required to provide Private Information to Defendant, either directly or through the institution, in order to access and use Defendant's Canvas platform and related services. Throughout her enrollment, Plaintiff Rewolinski used Canvas to access coursework, submit assignments, view grades, and communicate with professors, school personnel, and classmates.

131.     Plaintiff Rewolinski became aware of issues related to the Data Breach and service disruptions on or around May 7, 2026, when Canvas became inaccessible while she was preparing for final examinations. Plaintiff Rewolinski thereafter received notice from her school on or around May 8, 2026, that the system had been restored.

132.     The disruption materially affected Plaintiff Rewolinski because she was unable to access study materials and coursework necessary to prepare for a final examination scheduled for May 8, 2026. Plaintiff Rewolinski works full time while simultaneously attending law school full time and therefore had limited opportunities to prepare for and complete her examinations outside of weekends and Fridays.

133.     Plaintiff Rewolinski is still awaiting formal and direct notice from Defendant identifying the specific categories of her Private Information that were compromised and explaining the manner in which her information was accessed, exposed, or otherwise affected by the Data Breach.

134.    Because the Data Breach was an intentional attack by cybercriminals seeking valuable information that they could exploit, Plaintiff Rewolinksi remains at critical risk of severe identity theft, fraud, and exploitation.

135.    Plaintiff Rewolinski is very careful about sharing her sensitive Private Information and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

136.    Plaintiff Rewolinski takes great care to store documents containing personal information in secure locations or to properly dispose of such documents. She also exercises caution by selecting unique usernames and strong passwords for online accounts to protect her privacy and security.

137.    Plaintiff Rewolinski suffered actual injury from having her Private Information compromised as a result of the Data Breach, including, but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in her Private Information; (iii) lost or diminished value of her Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of her Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of her Private Information; and (viii) other economic and non-economic harms.

138.    The Data Breach has caused Plaintiff Rewolinski to suffer fear, anxiety, and stress, which have been compounded by Defendant's failure to fully disclose the scope of the Data Breach and the specific categories of information compromised. Plaintiff Rewolinski's concerns are further heightened by statements attributed to the threat actor ShinyHunters claiming that

Defendant's "Salesforce instance was also breached" and that "a lot more other data is involved," creating additional uncertainty regarding the full extent of the Data Breach and the information potentially affected.

139. As a result of the Data Breach, Plaintiff Rewolinski anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

140. As a result of the Data Breach, Plaintiff Rewolinski is at a present risk and will continue to face an increased risk of identity theft and fraud for years to come.

141. Plaintiff Rewolinski has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ALLEGATIONS

142. Plaintiffs bring all claims pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), individually and on behalf of the following Class and Subclass:

**Nationwide Class:** All persons residing in the United States whose Private Information was accessed, exfiltrated, compromised, or otherwise impacted as a result of the Data Breach, (the "Class").

**California Subclass:** All members of the Nationwide Class who were residents of California at the time of the Data Breach.

143. Excluded from the Class are Defendant and its officers, directors and employees; any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

144. Plaintiffs reserve the right to modify and/or amend the Class, including, but not limited to, creating additional subclasses as necessary.

145. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

146. All Class Members are readily ascertainable in that Defendant has access to addresses and other contact information for all Class Members, which can be used for providing notice to Class Members.

147. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

148. *Numerosity.* The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, based on Defendant's public statements and contemporaneous reporting, the Nationwide Class consists of millions of members. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records. The California Subclass consists of thousands of members at minimum, including students, parents, faculty, and staff associated with California school districts, colleges, universities, and other educational institutions utilizing Defendant's Canvas platform, including, upon information and belief, Downey Unified School District and numerous other California educational entities impacted by the Data Breach. Defendant itself has publicly represented that many of California's 113 community colleges have adopted or committed to adopting Canvas as their course management system, further demonstrating the widespread use of Defendant's platform throughout California. The exact number and identities of California Subclass members

are within Defendant's exclusive knowledge and control and can be determined from Defendant's records and the records of Defendant's institutional customers.

149.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Defendant.

150.    **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class that Plaintiffs seek to represent; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

151.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

152.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.     Whether Defendant engaged in the conduct alleged herein;

b.     Whether Defendant violated the FTCA;

c.     Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

d.     Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

e.     Whether Defendant failed to adequately safeguard Plaintiffs' and the Class' Private Information;

f.     Whether and when Defendant actually learned of the Data Breach;

g.     Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

h.     Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

i.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

j.     Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

41

k.      Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and

l.      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

153.    Class certification is also appropriate because Defendant, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to Plaintiffs and the Class as a whole, making injunctive and declaratory relief appropriate to Plaintiff and the Class as a whole.  Moreover, Defendant continues to maintain its inadequate security practices, retain possession of Plaintiffs' and Class Members' Private Information, and has not been forced to change its practices or to relinquish Private Information by nature of other civil suits or government enforcement actions, thus making injunctive relief a live issue and appropriate to the Class as a whole.

154.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notices about the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE *PER SE*
#### (On Behalf of Plaintiffs and the Nationwide Class)

155.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 141, as if fully set forth herein.

156. Defendant collected, stored, and maintained the Private Information of Plaintiffs and Class Members as part of the regular course of its business operations, which services affect commerce.

157. Plaintiffs and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

158. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

159. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duties included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

160. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

161. Defendant also owed Plaintiffs and the Class a duty to exercise reasonable care in the collection, storage, safeguarding, and protection of their Private Information. That duty arose from, among other sources: (a) Defendant's special relationship with Plaintiffs and Class Members as the custodian of their Private Information and educational records; (b) Defendant's status as a

43

provider of educational technology services and learning-management systems used by schools, school districts, colleges, and universities to process and maintain student, teacher, and institutional information; (c) Defendant's obligations under federal and state privacy laws; (d) Defendant's express undertakings, through its public-facing privacy policies and security representations, to protect the information entrusted to it; (e) Defendant's actual knowledge of prior cybersecurity incidents and the well-known threat environment facing educational technology platforms; and (f) the foreseeable and substantial harm to Plaintiffs and Class Members that could result from unauthorized access to and disclosure of their Private Information.

162. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information stored within it.

163. Defendant's duty to implement reasonable security measures also stems from common law, as well as regulations under the FTC Act, both of which require the Defendant to use appropriate cybersecurity measures.

164. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of engaging with Defendant, and because Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

165. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

166. Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

167. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

168. Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

- Failing to adequately monitor the security of its networks and systems;

- Allowing unauthorized access to Class Members' Private Information;

- Failing to detect in a timely manner that Class Members' Private Information had been compromised;

- Failing to remove the Private Information of individuals it formerly engaged with when it was no longer required to retain that information pursuant to regulations; and

- Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate action to mitigate the potential for identity theft and other damages.

169. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

170. Plaintiff and Class Members were within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

171. Defendant's violation of the FTC Act also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiffs and the proposed Class Members from the harms associated with data breaches.

172. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

173. Defendant has acknowledged that an unauthorized party gained access to its systems and that the Private Information of Plaintiffs and Class Members was compromised as a result of the Data Breach.

174. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

175.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

176.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in Defendant's industry.

177.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

178.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

179.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and is believed to remain in, Defendant's possession.

180.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

181.    Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

182.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

47

183. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

184. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

185. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

186. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Nationwide Class)**

187.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 141, as if fully set forth herein.

188.   Plaintiffs and Class Members, either directly or through their schools, school districts, colleges, universities, and other educational institutions, conferred benefits upon Defendant by providing their valuable Private Information to Defendant and by participating in educational programs, services, and platforms that generated substantial revenue for Defendant, including through institutional licensing agreements, tuition-funded payments, subscription fees, and other compensation associated with Defendant's Canvas platform and related educational technology services.

189.   Defendant appreciated, accepted, and retained the benefits conferred upon it by Plaintiffs and Class Members. Defendant knowingly collected, stored, maintained, and monetized Plaintiffs' and Class Members' Private Information and derived economic benefit from providing educational technology services to institutions utilizing Defendant's platform.

190.   A portion of the monies paid, directly or indirectly, for access to and use of Defendant's services reasonably should have been used by Defendant to implement, maintain, and monitor adequate data privacy and cybersecurity measures necessary to safeguard Plaintiffs' and Class Members' Private Information.

191.   Plaintiffs and Class Members reasonably expected that Defendant would implement and maintain adequate safeguards to protect the sensitive educational, personal, and communications data entrusted to its care, particularly in light of Defendant's representations concerning privacy, security, statutory compliance, and the protection of student information.

192. Instead, Defendant failed to implement and maintain reasonable cybersecurity safeguards sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized access, disclosure, exfiltration, and misuse.

193. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between the educational technology services with adequate data privacy and security protections that Plaintiffs and Class Members reasonably expected to receive, and the allegedly deficient services without adequate data privacy and security protections that were actually provided.

194. Plaintiffs and Class Members have no adequate remedy at law.

195. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered and continue to suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) loss of privacy and confidentiality in their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with monitoring accounts and mitigating the actual and potential consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) emotional distress, fear, anxiety, and frustration arising from the compromise of their Private Information and the increased risk of fraud and identity theft; (vii) the present and continuing risk of identity theft, fraud, phishing, and other misuse of their Private Information; and (viii) other economic and non-economic harms.

196. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer additional forms of injury and harm.

197. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits it received from Plaintiffs and Class Members because Defendant allegedly failed to implement and maintain the reasonable data privacy and security measures that Plaintiff

and Class Members reasonably expected and for which Defendant was compensated, directly or indirectly, through its provision of educational technology services.

198. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds retained by Defendant as a result of its conduct.

199. A constructive trust should be imposed upon all unlawful or inequitable sums retained by Defendant traceable to Plaintiff and Class Members.

**COUNT III**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**CAL. CIV. CODE § 1798.100 *ET SEQ.* ("CCPA")**
**(On Behalf of Plaintiffs Jasmine Hernandez-Silva, M.C. 1, M.C. 2 and M.C. 3,**
**and the California Subclass)**

200. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 141, as if fully set forth herein.

201. Under section 1798.150(a)(1), "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Civil Code section 1798.81.5(d)(A)]…is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief (including future data breaches or other compromises of his or her PII that remain in Defendant's possession), and any other relief the court deems proper.

202. The duty of care under CCPA is clearly stated in section 1798.100(e): "A business that collects a consumer's personal information shall implement and maintain reasonable security

procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure."

203. Under section 1798.140(i), Plaintiffs and California Subclass members are consumers and California residents.

204. Defendant Instructure is a "business" under section 1798.140(d). Defendant does business in the State of California and is "organized or operated for the profit or financial benefit of its shareholders or other owners." Upon information and belief, Defendant had annual gross revenues in excess of twenty-five million dollars ($25,000,000) during the relevant calendar year in accordance with section 1798.140(d)(7)(A).

205. Defendant "collects" "consumers'" personal information in that it gathers, obtains, receives, stores, accesses, processes, and maintains information, either actively or passively, from students, parents, guardians, faculty, staff, and educational institutions residing in California through its Canvas platform and related educational technology services.

206. Personal information is defined in Section 1798.81.5(d) and related sections including Section 1798.140(v)(1). In conformity with those provisions, Defendant actively and passively collected, gathered, obtained, received, accessed, stored, and processed unredacted and unencrypted personal information belonging to Plaintiffs and California Subclass members. Upon information and belief, the information maintained by Defendant included, among other things, names, school-issued email addresses, student identification numbers, enrollment information, assignment grades, educational records, private communications exchanged through the Canvas platform, and other information reasonably capable of being associated with, or linked directly or indirectly, to a particular individual or household. Upon information and belief, Defendant also maintained additional categories of sensitive personal information through its Canvas platform,

related systems, and associated infrastructure, including potentially through the allegedly compromised Salesforce environment referenced by the threat actor ShinyHunters. The full scope of the information compromised in the Data Breach has not yet been disclosed.

207. Defendant collected, stored, and maintained Plaintiffs' and California Subclass Members' Private Information in a manner that permitted unauthorized actors to access, exfiltrate, acquire, and potentially disclose it during the Data Breach.

208. The purpose and means of processing such personal information were central to Defendant's business operations as an educational technology and learning-management-system provider. Defendant processed and maintained this information to provide educational institutions, students, faculty, staff, and other users with educational management, coursework, communication, grading, and related services through the Canvas platform.

209. Defendant operates a large-scale educational technology platform used by schools, school districts, colleges, universities, and other educational institutions throughout California and the United States. Defendant customizes and tailors its software, platform services, and data-management processes to facilitate coursework administration, communications, grading, enrollment management, and related educational functions involving substantial quantities of students' and users' personal information.

210. Defendant provides a cloud-based educational platform designed to centralize and manage educational administration, coursework, communications, and records using systems containing Plaintiffs' and California Subclass Members' Private Information. Defendant participated in determining how Plaintiffs' and California Subclass Members' Private Information would be processed, stored, maintained, and accessed through the Canvas platform, including

establishing the processes through which educational institutions uploaded and maintained sensitive educational and personal information.

211. Under section 1798.140(v)(1), Plaintiffs' and California Subclass Members' Private Information was subject to unauthorized access, acquisition, exfiltration, theft, and disclosure as a result of the Data Breach. Upon information and belief, the Data Breach exposed Private Information including, but not limited to, names, school-issued email addresses, student identification numbers, educational records, enrollment information, assignment grades, and private communications exchanged through the Canvas platform. To the extent the Data Breach involved categories of information identified in Cal. Civ. Code § 1798.81.5(d)(1)(A), Plaintiffs and California Subclass Members seek relief under Cal. Civ. Code § 1798.150.

212. The Data Breach occurred as a direct and proximate result of Defendant's failure to maintain and implement reasonable security procedures, practices, and systems appropriate to the nature of the highly sensitive Private Information entrusted to it. Defendant's failures included, but were not limited to, failing to adequately monitor and secure its systems, failing to timely detect unauthorized access, failing to appropriately restrict and manage access privileges, failing to adequately remediate known cybersecurity vulnerabilities, failing to follow industry-standard cybersecurity practices, and otherwise failing to implement reasonable safeguards sufficient to prevent unauthorized actors from accessing Plaintiffs' and California Subclass Members' Private Information.

213. Pursuant to section 1798.150(b), Plaintiffs provided written notice to Defendant specifying the provisions Defendant violated and stating that Defendant had thirty (30) days to cure. Defendant failed to cure those violations, thereby entitling Plaintiffs and California Subclass Members to seek actual damages and statutory damages of not less than $100 and not greater than

54

$750 per consumer per incident, together with injunctive relief, declaratory relief, and any other relief the Court deems proper.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a.  For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

b.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

c.  For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.  requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.  requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, phishing attacks, social-engineering attacks, impersonation schemes, fraud, and unauthorized use of

their Private Information for Plaintiff's and Class Members' respective lifetimes;

v.  requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

vi.  prohibiting Defendant from storing Plaintiffs' and Class Members' Private Information in an unreasonably insecure manner and requiring Defendant to implement appropriate safeguards, segmentation, access controls, encryption, and monitoring for any cloud-based systems containing such information;

vii.  requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.  requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.  requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.  requiring Defendant to conduct regular database scanning and securing checks;

xii.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as

56

well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

xix.   requiring Defendant to implement enhanced safeguards and monitoring procedures specifically designed to protect student records, minors' data, educational communications, and other information protected under federal privacy laws and regulations;

d.   For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

e.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.   For prejudgment interest on all amounts awarded; and

g.   Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

58

DATED:  May 11, 2026

**CHRISTENSEN & JENSEN, P.C.**

*/s/ Karra J. Porter*
Karra J. Porter
Nathan D. Alder
Kristen C. Kiburtz
Yuchen Cook

**HECHT PARTNERS LLP**
Lori G. Feldman*
Justin Alvarez-Herman*
Tiffany Wong*
125 Park Avenue, 25th Floor
New York, NY 10017
Phone: (212) 851-6821
lfeldman@hechtpartners.com
jalvarezherman@hechtpartners.com
twong@hechtpartners.com

*Attorneys for Plaintiffs and the Putative Class*

*\*Pro Hac Vice forthcoming*

59